Good morning, everyone. This is Judge Wilson in Tampa. Judge Lagoa is in Miami. Judge Anderson is in Macon. And I think we're ready to proceed. Before we begin, I'd like to thank counsel for your cooperation with the court in accommodating these arguments by telephone, and especially your cooperation with Mr. Barrera of the Circuit Executive's Office and Ms. Nuremberg, the Deputy Clerk. And of course, Mr. Robinson, who will serve as our courtroom deputy this morning. As you've been advised, Mr. Robinson is the timekeeper. And so he will let you know when your time is up. He'll let you know when the yellow light is on and the red light is on. So I think we're ready to proceed. The panel has not previously conferred with regard to any of these appeals that we will hear this morning. And we have three that we will hear this morning. But we have read the briefs and examined the relevant parts of the record, if that will assist you in confining your arguments to the issues on appeal. So we are ready to proceed and we'll begin with the first argument. This is the United States of America versus Kerim Muzaham. Ms. Weil, Amy Weil is here for the appellant, Muzaham. Jordane Learn is here for the government. And Ms. Weil, are you ready to proceed with your argument? Yes, I am, Your Honor. You may proceed. Thank you. Good morning and may it please the court. My name is Amy Weil and I represent the appellant, Mr. Muzaham. The district court in this case clearly erred in assessing the two-level enhancement for maintaining a premises for the purpose of distributing drugs. The commentary makes clear that this enhancement applies when a defendant maintains a building, room, or enclosure for the purpose of manufacturing or distributing drugs. Here, Mr. Muzaham had a business, but he was in business for six years. He moved it to the current location and he was there for three years. During that period of time, he had 11 packages of marijuana distributed. I'm sorry, 13 packages on 11 days. This is only 11 days during that period of time. The commentary makes clear that this guideline is intended to punish more harshly people who maintain a premises, maintain the property for a primary purpose, which would be something like a stash house or a drug den. We have plenty of cases in this circuit. Let me ask you this. This is Judge Wilson, Ms. Weil. Can a premises have more than one primary purpose? In other words, is it possible that a premises can have, as its purpose, a convenience store and a place for the distribution of drugs? If that's the case, then distribution of drugs is more than incidental or collateral, isn't it? Well, a primary really implies that primary in principle really implies that it's the one, that that's the reason you have that business going. For example, with the stash house, you have that there. Maybe you've rented the property. Maybe you've designated a part of your home or garage or something to stash drugs in. The suggestion by saying it's principle or primary would suggest that that's supposed to be the reason it's there. But even if you say that there are two, you could have two primary, which seems incongruous, but you can have two primary purposes. In this case, Mr. Muzahim was running a business that was not a front. If you look at the photographs that were put into evidence at the sentencing hearing, those photographs show this is a thriving business. He testified that he made between $2,800 and $3,500 daily at this store through the goods that he sold in the store. The shelves were brimming with merchandise. It was clearly a functioning, successful store. What he was doing was infrequently. This is on 11 days during the whole period of time he had this business. Well, but does it matter that it's infrequently? That's not the standard. Isn't the standard it has to be collateral? Well, one of the commentary to the guideline, Application Note 17, that says in making the by the defendant, and that is versus whether it's used for lawful purposes. So you are, Your Honor, supposed to weigh the frequency of the use. It specifically says the word frequency. So if you look at how frequently this property was used, 11 days over a 1,000-day period is way infrequent. This is more like- Well, let me ask you a question regarding the commentary. Obviously, you don't dispute that your client held a possessory interest in the property, right, in the premises? No, Your Honor, we don't. And you don't dispute that he obviously controlled the access or the activities on the premises? No, Your Honor, we don't. Is it sufficient that there was a legitimate business running? Is that in and of itself enough? Well, that's one of the factors. The only case we have in this circuit that really talks about this is George. And you really have to compare this case to George. Because in George, you have a fellow who was running a drug business out of his apartment, I think, or home, his residence, and then opened this shop. And that was clearly a front. This shop was a front for the ongoing drug business. He had two barbers who ended up- they weren't even working there by the time he was arrested. He had ongoing drug dealings. And in the past- Well, that was also a short timeframe, correct? In George, it was only like a one and a half month or two month period between opening the shop, the barber shop, and the church floor. Well, but the point being that the entire time he was in business in the shop, he was dealing drugs out of it. No, I understand that that case clearly was more of a front. In this case, is there any evidence other than what you discussed already to support an argument that the store, the grocery store, was a front? Argument to support the grocery store in our case was not a front. Because clearly- No, I understand that. But is there any evidence to the contrary? Any evidence to show that it wasn't? That it was not a front? Yes. The evidence was, first of all, it was an ongoing business he was making money from. Second of all, none of the employees who worked in the store ever saw anything about drugs. Nothing ever happened in the store about drugs. We know that he put the pack- But didn't he have some weapons in the back or other paraphernalia? I'll talk about that. First, he had the two weapons, both of which were purchased before he ever got involved with taking these packages of marijuana. Both of them were purchased for protection in the store long before he ever accepted the first package. Second of all, there was evidence that there was a scale and there was something in the pre-sentence report about suspected marijuana on the scale. And if you look at the testimony from the agent during the sentencing hearing, the agent testified they don't know whether that was marijuana. They never tested it. And if you look at the pictures, you can see pictures that are put into evidence, that picture of the scale. It was this three-by-four-inch, small little folding scale that was in a drawer somewhere. It wasn't some massive scale to be weighing the amount of marijuana that was in the packages. The packages were never opened in the store. So the scale is red herring. Well, now, Ms. Wall, we might weigh the facts differently than the district judge did. But aren't we required to apply a clearly erroneous standard of review if there are two permissible views of the evidence? Isn't it the district judge's choice between them? And so that can't be clearly erroneous if we apply that standard of review, can we? Well, Your Honor, I agree. Yes, the standard of review is clearly erroneous. But if you're looking at the findings that the judge made, he didn't make specific findings with respect to what was going on in the store. His findings were actually contrary to a finding of maintaining the premises. He found, and I quote, it's not unusual for a premises to be used collaterally for the drug. At the same time, it's used for other purposes. Well, you're seizing on that word collaterally. But it seems to me that what the judge was saying was that this business had two primary purposes. Number one, a convenience store. And number two, a place for the distribution of drugs. If that's the case, if there are two primary purposes and we look at a totality of the circumstances and the district court took into consideration the totality of the circumstances, aren't we required to defer to the factual findings by the district judge under the clearly erroneous standard of review? Yes. Yes, Your Honor. Absolutely. With respect to the factual findings he made. And as I'm pointing out, he didn't make factual findings with respect to any of the disputed facts. So our position is that the undisputed facts... He misapplied the law? Yes. That when you look at the facts that are undisputed, which are 11 packages over this, well, the entire period of the conspiracy, let's call it a thousand-day period of time, that he was involved, 11 packages. This is only 11 out of 37. This isn't the only location he had packages delivered. He just needed an address because this Mr. Al-Jazra had moved to California. He no longer lived in California. So Al-Jazra wanted a place to send drugs. And so he found addresses to send them to. This was one of the reasons... This is Judge Anderson with a question. I realize that several of the cases have a lot more evidence than in this case, but the George case involved not only that barbershop with the back room that you talked about, but it also involved his apartment, George's apartment. And the court said that even though there was only one delivery of drugs, one transaction there, that nevertheless, it was one of the primary purposes. And the court, I think, held that it can be... Page 1206 to the right column. It can be a primary use, quote, so long as the drug activity is more than incidental and or collateral. So how do you get around George? It seems like to me, there's as much evidence here as there is with respect to his apartment, not the barbershop in the back room. Well, because, Your Honor, before... Counsel, you have two minutes remaining. Before Mr. George opened the store, he was using his apartment. That was what his apartment was. It was where he was storing and selling drugs from. So that's totally unlike... There are plenty of cases where we would agree that if that's what you're doing, and you're running sort of a business out of your home, that that would qualify. But that's not what happened here. Why is this case not like the home? The home is used 100% for personal use, but also so long as it's not incidental or collateral, drug transactions out of the home make it... Because Mr. Muzdahim wasn't running a drug business. He was being an address for the acceptance of packages. If you were to say that anytime there is an address for the acceptance of packages, then every single drug deal would be included because... There's evidence that he made repeated sales there, in addition to receiving the 13 packages. Your Honor, there is no evidence that he was involved in any sales. There was Mr. Mead, who they thought be engaged in suspicious activity. Your Honor, I think my time is up, but it's about to be up. If I can finish this. You can finish your response to the judge's question. I would like to finish and to respond to the testimony by McDaniel, the employee who said that customers told her that this defendant made repeated sales at the store. And the co-conspirator, Jasrez, however you pronounce it, also testified that the defendant made sales from the store. Is that not true? Well, Your Honor, I'll go in order of what you said. With respect to Mr. Mead, there was no evidence connecting this. First of all, there was no evidence connecting Mr. Muzahim with whatever Mr. Mead was doing in the parking lot. Second of all, this provision covers enclosures. It doesn't cover a parking lot. It specifically says in Section 17, even if there were evidence connecting Mr. Muzahim to whatever Mr. Mead was doing in the driveway, this section in Note 17 says that if a defendant maintains a building, room, or enclosure. And so that wouldn't count anyway if it's outside in the parking lot. And also there was suspicious activity, which didn't include anything to do with Mr. Muzahim. Second, Ms. McDaniel testified that she heard essentially gossip that heroin and cocaine was being sold. Well, that wasn't even true. I mean, that's not even involved in this case. She didn't hear anything about anything about marijuana being sold. So I don't, that doesn't support, she doesn't support a finding of maintaining the premises. And finally, you asked me about Al Jazra. And he had moved to California. So he was not here. He was sending packages. And the packages were being picked up, sometimes I think by a relative of his. And they would be almost immediately, this is a turnaround. This is a drop-off location. And if this court were to find that every time there was a drop-off location, that that gave you a two-level enhancement, every single case would have one. Because there's always a drop-off location. All right. Thank you. Thank you, Ms. Weil. And we will hear from the government. Ms. Lern. Is it Mr. or Mrs. Lern? It's Ms. Lern. Oh, Ms. Lern. I'm sorry. No, no problem. Good morning, everyone. May it please the court. This is Jordan Lern speaking on behalf of the United States. Judge Anderson, I think you said it best. That the only presidential opinion in this court that concerns this enhancement is the United States v. George. And George doesn't set the bar very high for the application of the enhancement. Well, but doesn't George, with respect to the business, and let's deal with the business, not the apartment. With the business, in that case, it clearly was a front. Because it was only an operation for less than a month or a month and a half before there was a search warrant issued. Two of the barbers quit in the middle of it. And you had a backroom that clearly was an operation, a drugstore operation. And they were running the drug operation from the backroom. Here you have a store that is a legitimate store that actually has sales of $2,000 or $3,000 a day. How is this case the same? Yes, sure. I would say, I think the evidence that this business, the barbershop and George, that it was a front is stronger. I don't think the government has ever seriously disputed that Mr. Muzahim's business functioned legitimately. The reason that doesn't carry the day for Mr. Muzahim is that the guidelines specifically contemplate that a premises, such as the Chicago store and deli, could have multiple primary purposes. And so even though you have... But the issue is not primary, primary or principal. The issue, it has to be, it cannot be incidental or collateral use of the premises. So how in this case is it not an incidental or collateral use of the premises when you have an actual operation where the premises is being used primarily and for the principal use of being a grocery store or, you know, a convenience or whatever it is? Sure, Your Honor. I would say, well, it's a totality of the circumstances analysis. And I would say that... Okay, but words have significance and the word incidental or collateral has a meaning and it has a usage in the English language. And you cannot have something, you cannot have two principal uses. Either one is, they're both principal or you have one that is incidental or collateral. So how in this case is it not incidental or collateral? I would say that you can have multiple principal or primary uses of the premises. I think the guidelines specifically contemplate that. And that is played out in this court's precedent and the precedent of other courts. And the most common example that you see is not necessarily a business, but I would point to where it's a house or in Georgia an apartment. And so you can have something that serves 100% as your primary residence. But if you're still using that as an integral and important part of your drug distribution activities, then that also, as this court has held, can be a primary purpose of the premises. Okay, but collateral means additional but subordinate secondary. Is this, in this case, do the facts not bear out that this, in fact, was a secondary or subordinate use of the premises? I would say no, Your Honor. I would say that it's an additional use of the premises. But in line with this court's precedent and the guidelines, it still can, the district court can still reasonably conclude, based on this evidence, that it was a primary purpose of the premises. The district court, I'll refer to some of the district court's findings. He says that the center of the organization, the drug organization, was the store. He also says, refers to it as the business office of the conspiracy, and that it was used repeatedly for drug dealing activity. I also want to point out, I know that Government's Exhibit 2 establishes basically a period of three months between October 2016 and December 2016 where Mr. Muzahim was receiving packages. But I think the totality of the evidence in this case establishes that the district court was right to reason that the drug dealing activities, in this case, continued at the store past that time period, and that, in fact, this wasn't an instance where he was merely receiving deliveries. Al Jazra gave two statements to law enforcement where he said that Mr. Muzahim was storing and selling marijuana at the store, and that he kept the marijuana either under the front counter or in the back office safe, where he also kept his drug proceeds, and a sawed-off shotgun. And so I think that goes to show that certainly it was an integral, the usage of the store was an integral part of this drug conspiracy, and that certainly supports the district court's application of the enhancement. I'd also point the court to as late as August of 2018 when we had the search, you found a scale of marijuana residue, a marijuana packaging envelope, both of which the government's witness in this case testified were indicative of drug trafficking. They also found a safe in the back with money, which corroborated Al Jazra's testimony, not testimony, his statement, because he did not testify at the sentencing hearing, as well as the shotgun with a shorter barrel. So there are certainly things that are corroborating that this is more than just a drop-off location for the marijuana shipments. I'd also point the court to the fact that the defendant testified that he received payment for marijuana at the store, and that it would be brought from Al Jazra's siblings, who were also involved, and they would bring it to him specifically at the store to pay him. Mr. Muzahim also recruited a store employee to receive marijuana packages at her home. Obviously, that's not, she's not receiving them at the store, but it's a usage of his position at the store, his ownership of the store, to further the marijuana conspiracy in this case. So I think there's substantial evidence to find that this really was an integral part of, the store was an integral part of the drug trafficking conspiracy. So is the store employee who received the drugs in their home, are they, should they be given a two, should they be given an enhancement as well, a two-point enhancement? I would say in this case, I think the testimony was the employee didn't know that she was receiving marijuana. I think you might need more than just receiving it at your home, incidentally, and I don't recall specifically how many times she received it. But I think in this case, the evidence, it's more than just the receipt of the deliveries. You also had evidence that Al Jazeera told investigators that Mr. Muzahim had a phone that he primarily used for his marijuana transactions. And that was, and that was found in the store in 2018, not on Mr. Muzahim's person, not in his home, but in the store. And the, some of the, some of the 37 shipments that were depicted in Government Exhibit 2, some of that information came from the data that was derived from Mr. Muzahim's phone, as well as the phone of co-conspirator Joshua Mead. And we know from the pre-sentence report that was not objected to by Mr. Muzahim that Joshua Mead was observed and found to be selling marijuana outside the store. And at least one of those transactions appeared to involve Mr. Muzahim. So you have this very, very convincing web of transactions and things that are all centered around the Chicago store. And certainly given the totality of the circumstances, everything that I've listed and everything that's in this record, I don't believe the district court would clearly err and apply enhancement under these circumstances. Judge Anderson with a question. Your opponent argues that employee McDaniel's testimony to the effect that the defendant was selling cocaine and heroin at the store does not count because this is a marijuana conspiracy. How do you respond to that? I would say, I don't think her, her, her statement, if I recall correctly, was that he was selling drugs such as cocaine or not. Yeah. Cocaine and heroin, I believe. So that to me does not indicate that that was an exhaustive list. I think the important part was that she understood that he was selling drugs. And when you pair that understanding, sure, there's no evidence of cocaine or heroin in this case, but you have an employee who understands that her boss is selling drugs at the store. And then you have all this other evidence that shows these marijuana transactions that are, that are, that are happening at the store, that marijuana that was previously delivered to the store. But I think that certainly supports the district court's conclusion. It's certainly relevant to the district court's application of the enhancement in this case. The other thing I'd like to point out, this is, this is Judge Wilson, Ms. Lern. If selling drugs cannot be a collateral purpose for the premises to support the it's not unusual for premises to be collaterally, to be used collaterally, collaterally for the drugs at the same time, it is used for other purposes. Doesn't that suggest that the court misstated the law by suggesting that it could apply the enhancement, even if the drug activity was collateral, was a collateral use of the property, which is in opposition to the guideline commentary. Sure. Sure. Your honor, I was actually just about to jump to that point. So I think you said it best earlier, when, if you read the entire statement in context, when you compare it to the point, the argument from defense counsel that the district court was responding to, was that this was a legitimate, an entirely legitimate business, only a fraction of the days that the business has been open involved marijuana transactions. And therefore, that purpose pales in comparison. It's similar to what we've been talking about. And I think the district court comments were aimed at, at the idea that you can have multiple primary purposes. Sometimes some of those purposes may be more prevalent. Like you said, that often the example of the residence, nobody's going to dispute that if you had to rank numerically, your primary purposes, your home is going to be number one, as opposed to even if you're using it every weekend to sell drugs. So I think that's, that's what the district court was responding to. And I think his comments that follow the collateral comment, make it really clear that he was contemplating this enhancement exactly the way that the guideline, uh, he should not have used the word collateral. I don't disagree your honor. I think, I think, um, the guidelines are clear that it can't be a collateral purpose, but I would say this, the fact findings that follow that statement, make it clear that, I mean, they're inconsistent with a finding that it was a collateral purpose, right? If he was, if he found and concluded, it was merely an insignificant or collateral purpose, he wouldn't have said it's the center of the organization. But let me, let me ask you a question though. When you, when you read the, the, uh, the discussion that the court had after the collateral, um, discussion, it seems that, uh, the, the, the district court ruled that one, obviously the defendant and no one disputes that he controlled the premises and, um, he controlled who had access to the premises, but that's really only two of the factors. The third factor is you then have to decide whether the premises is, is the use of it is incidental or collateral. And so it doesn't appear that he then makes that finding or did he misapply the law then at that point and said, I'm finding then that because it is the center of the organization with the store that therefore it's not collateral or incidental. Is that your position? Our position is that there's not a clear thing that it was a primary or principal use, but I think the factual findings that we know the district court made supports the conclusion and the ultimate application of the enhancement. The first being that it was the center of the store. Um, I can point to some other parts in the record, um, that concern not specifically the premises enhancement, but he also said that he also relied on evidence, um, that he discussed during the firearm enhancement and he made some finding there, there that I think is relevant, which he said that there were other activities besides the delivery that were going on in the store. Um, he referenced the suspicious activities, including co-conspirator Joshua Meade's distributions in the stores, um, in June of 2018. Um, he finds that the firearms were near where drugs were delivered and distributed, um, and, and says that the evidence seems to indicate that the drugs were Thank you. Um, so I think if you read the record in totality, I think it's clear the district court didn't misapply the enhancement, even though he used the word collaterally. I'd also point out to the court, um, that the district court expressed familiarity with this enhancement, the parties and their comments and arguments to the court apply the proper standard and emphasize that it had to be a primary or principal. It couldn't be collateral. So certainly the district court referenced collateral. I think though, when you read everything together and in the record, and you pair that with the undisputed evidence in the pre-sentence report, it's clear that the district court did not clearly err in applying this enhancement, even though another fact finder could have perhaps viewed the evidence differently. The final point I'd like to make, if I may, is that, um, the Miller case makes the point, this is the exact, well, Miller discusses it in the context of a house, but this is the exact kind of, um, premise, use of a premises that is intended to trigger this, that Congress and the Sentencing Commission intended to trigger this two level enhancement. You have a defendant who is accepting marijuana at his store, his convenience store that he runs as a legitimate business. And so he's intermingling drug distribution with legitimate commerce. Why didn't the government seek to forfeit the store? Your Honor, to be candid with you, I'm not entirely sure. I think the forfeiture argument, I think the standard for forfeiture is lower, right? We just have to show that the store was used. And I think that's clearly met here. And I also think, so, therefore, it wouldn't be dispositive of whether or not the enhancement applies, but I don't think it's relevant to whether or not the guidelines calculation was, um, the guidelines are correctly calculated when the evidence otherwise supports the enhancement. Um, I see my time is up. We have your argument. Thank you. Thank you. Thank you, Ms. Learn. And Ms. Wall, you have reserved some time for rebuttal. Your Honor, first of all, with respect to principle use, the definition of principle is the first in order of importance or made. And certainly it is impossible to say that when you have 11 instances over a, what, three-year period the store was open of accepting packages, over a 52-day period, only 11 times, that that is a main and principle use of the property. That just doesn't, that defies common sense. It obviously is an incidental or collateral use of it. It's collateral even to this drug enterprise because there were 37 packages and this was only, um, 13 of the packages were delivered there. One other location, there were 10 packages delivered there. It's not even primary to the, to the use of the organization. I'd like to also point out that the judge did not make a finding, any findings, when he made the finding, um, on this being, uh, maintained the premises. He didn't make any of those findings about storage and all that other stuff in the guns because he made a gun finding because the standard for a gun finding is whether it's improbable that a gun was, and Mr. Musahim clearly bought those guns long before this drug thing happened and everyone knows how, uh, risky it is to run a, um, convenience store. So, uh, it's not surprising that he had two guns there. And that was not a short barrel shotgun. It would have obviously been charged as one. That's illegal to hold. So, he legally went through the process of buying them and submitted the forms and bought them legally, those two guns, to protect his property. But because they were there, it's impossible to carry a burden showing it was improbable that it had anything to do with it. Because Mr. Musahim, I'd like to point out, has admitted everything that he did, the actual things that he did in the store. He's admitted receiving these packages. He's admitted his involvement. He's pled guilty. What he does not admit was that this, this application would apply to him. And I can't emphasize enough that the application, if it were to apply to Mr. Musahim, would apply in every case because you have to receive it somewhere. And the question is whether you are worthy of an enhancement because you're an aggravated person, whether you are more culpable than the normal person because of your conduct. And that does, that is true with people who run stash houses and dope houses, where they are using some property to run a drug business out of. And that just wasn't happening here. We're not saying he's not guilty of the offense. What we're saying is that he didn't maintain his property for a primary principle purpose of drugs. And I think we have your argument, Ms. Lyle. Thank you. All right. Thank you. And thank you, Ms. Lerne.